Thank you, Judge Graver. My name is David Wedby. I represent Dave Sanders. This case, as you know, arises under the Energy and Reorganization Act, and what I'd like to do is go through, talk a little bit about protected activity, and then causation, and then get to the issue of whether there is clear and convincing evidence that EN would have taken this course of action, but for the protected activity. Mr. Wedby, at some point in your remarks, could you also address why the plaintiff waited three months to file the amended notice of appeal with regard to the jury demand issue? I can address that first, Your Honor. Whenever you want. Well, I was not the lawyer below. That's why I said the plaintiff. So I understand. So I don't know why it did not take, it took that long, but what I can say is that I think it's clear from the, especially the order denying the plaintiff's motion to amend and stay the proceedings pending the tamasitis outcome, that the jury trial issue was very much at play, and from that, I think that it could be inferred that there was an intent to raise the issue, and that the mistake was inadvertent, and then secondly, I think under the Stewart test is that there was no prejudice here to the defendant, Energy Northwest, and that would be, I would just rest on the arguments. I guess I was just curious about the fact that the original notice of appeal was pretty specific with regard to challenging other issues in the District Court's October 4, 2013 ruling, but there is no express reference to the order striking the jury demand in the original notice of appeal. All I can say to tell him is I think it was inadvertently omitted. I don't know other than that. I'm sorry. I have a question about the protected activity portion of your argument, and I have a question for, just to clarify your position. It appeared to me that there were at least two types of activities involved. The challenge to the severity ranking of the condition report, Charlie versus Bravo, and also a dispute with Mr. Pease about security procedures and badging. Are you alleging that both of those aspects are protected and both of them causally related, or are you limiting your generally an issue here and would implicate safety procedures, and the reason is because the badging procedure is what governs who can come on to the... No, no. I understand that substantively. I guess I wasn't clear whether you were arguing both of those aspects, that your argument covers both of those things or just one of them. Well, I think that the main point is that the ranking issue and the thoroughness with which the condition report was investigated, be it under the Bravo or the Charlie designation, that that implicates essentially the integrity of the badging procedure and that this was what the argument was between Mr. Pease and investigators. Okay, so they're related. Yes. Okay, I understand that. But doesn't that go to the speed with which the issue was being Well, Judge Talman, the standard in the Energy Reorganization Act says whether the activity is in furtherance of safety, and what I would say is that just because Energy Northwest was apprised that there was a problem with the badging procedure, that the manner with which they addressed it, be it a sort of the light touch that came with Charlie or the more searching review trying to get to the sort of the causes and what could be the potential ways to remedy it and prevent it in the future, that that response is because it's more thorough in the second instance. Is that, I have to confess, I don't understand the Alpha, Bravo, Charlie, Delta distinction. It appeared to me that it was a timing issue, a sense of urgency, as opposed to a refusal on the part of the employer to address the issue. Well, the only thing I know about the distinction is Delta is simply a trend. Charlie is identify a problem doesn't require much work. A Bravo distinction is identify the problem, figure out what some of the causes might be, and then figure out how it can be prevented in the future. So there's an intensity of investigation difference as well as a timing difference that, in your view, would affect safety? Absolutely. Or potentially safety or security? Absolutely. And if I could just finish up, the Alpha required a full root cause analysis meeting with all of the interested parties. So I think that very much so, Judge Graber, the intensification or the intensity of the remedial measures is what implicates safety, and I think that falls squarely within the standard that protected activities are supposed to be in furtherance of safety. And when that's somehow thwarted, then that raises an issue under the ERA. Let me just ask, if I understand this correctly, that these two gentlemen who had a disagreement were at about the same level of responsibility in the administration. Am I right? I think that's roughly true, Your Honor. And so what we have is a quarrel between two people at the same level in the safety responsibility. I think there was a quarrel, but what I'm more interested in, or what I think is more important, is the implications of that quarrel. I know, but we're dealing with a whistleblower, and somehow or another he has to qualify as a whistleblower. They start out with whistleblowing at each other. Is that a fair characterization of it? I'm not sure that I would agree with you, Your Honor, respectfully. Well, they were complaining. One was complaining that I want the one assigned to you to have a higher rating. Correct. And that one had one violation, one individual accused or failed to turn in the badge on time. Yes. And the other one had seven or more. I thought it was maybe three or more, but... Well, had more, and they reported this. They reported their disagreement to the management, right? And it's up to the management to decide whether to assign it a certain level of response. That is true. Now, where precisely in anything that this man uttered to anybody shall we label whistleblowing? I think the court should label whistleblowing, as I've said, when Mr. Sanders wanted to make sure that there was consistency between the standards... He pointed out to not only a peer, but also with management present, the fact that there was not a consistent approach to the designation of these various flaws in the badging procedure that came up under these condition reports, and that was the whistleblowing activity. So he was whistleblowing about the conduct of management in not treating this one as more serious? Correct. Who did he tell about that? The issue was raised, I think, the plant manager, Mr. Bikazi, was there. The excerpt I have says he told Mr. Bikazi, I don't agree with their standards. I believe they're lower standards than what we're expecting from the plant. Right. And he went on to say other things as well. I think that's alerting the plant manager to their, at least Mr. Sanders' view, again, rightly or wrongly, that there was a discrepancy in the standards. What do we do with the fact that he essentially withdrew his concern the next day? Well, I would say that that's a disputed issue of factor, and I think that he lodged his objection and got on with it. But I thought he said something to the effect of, well, you guys do what you're going to do, and in essence, acceding to management's decision. Is that a contested issue? Does he say, I never said anything the next day? He may have conceded, not that the issue was being correctly decided, but that he wasn't going to fight it anymore. I think that there's a difference there. Well, I guess the question is, if you're asking me to conclude that he was engaged in whistleblowing activity, the fact that he essentially accedes to the management decision and makes no further complaint about the issue, makes it hard for me to conclude that it was a sincere whistleblowing effort regarding protected activity. Well, I think at the time, what I understand about Mr. Sanders' motivations is that he was concerned about retaliation, and that's why he didn't push it any further, and the retaliation happened anyway. And what evidence was there in the summary judgment record from which the jury could make that conclusion? That he was concerned about retaliation? After he said whatever he said the next day. I think the best evidence that I can think of right now, Your Honor, and I'm happy to go back and check better, is that it was in his testimony in front of the ALJ. How many months after that? Well, he was describing what he was thinking. I don't think that he brought it to us. I mean, I think the concern, at least that you're hearing from me, I'm not trying to speak for my colleagues, the concern I have is whether or not he can even make out a prima facie case of protected activity, and this is a very thin record compared to some of the cases that we usually see involving whistleblowers. Well, as far as I was going to, at least in the N. Ray Williams case, which I cited in my briefing, that decision cited, I think, 6th and 11th Circuit authority, listed out three different criteria to determine whether there's whistleblowing activity or not, and one of them was whether the whistleblower himself reasonably believed that he was pointing out safety concerns, and I think that certainly can be said, at least at the summary judgment phase, for Mr. Sanders. Counsel, you're down to about two and a half minutes. Would you like to save some rebuttal time? Thanks for the heads up, Judge Graber. It's just going to take me a minute. No problem. We're in no hurry. Sorry. There's got to be an accent to go with that. Twerk amongst yourselves, yes. I'm typing notes, as you see. So, Mr. Mio, see when you're ready. Thank you, Your Honor. May it please the Court, my name is William Mio. Oh, I'm sorry. I'll wait. That's okay. Okay, if it doesn't distract the Court, it doesn't distract me. I think we're fine. You can go ahead. Thank you. The district court correctly determined that the plaintiff, Mr. Sanders, did not engage in any protected activity as that term is defined under the statute, under the Energy Reorganization Act, Section 5851A1, which is fairly specific in the types of activities that elicit protection under the Act. Counsel, just speaking for myself, I have difficulty with that piece of it because it seems to me, as I read this on summary judgment where we have to take all facts in favor of the opposing party, the plaintiff did tell the plant manager that he was concerned that this incident was listed or this procedure was listed at too low a level of investigation, that it's a lower standard than is appropriate, a standard about safety, a standard about security. Following that, there is the conversation that the plaintiff has with two of the vice presidents, asking them to change a security clearance procedure that Mr. Pease had refused to change when asked, after which Mr. Pease confronts him and says, that's twice, and now I owe you one. So why couldn't a reasonable jury conclude that these efforts made to the plant manager and to the vice presidents were an effort to strengthen the safety and security procedures? The jury doesn't have to believe it, but why isn't there enough evidence to survive summary judgment? There's a couple of reasons. One, Your Honor, the incident to which you just referred occurred in March 2011. The only incident, the only action that the plaintiff is pursuing here on appeal occurred in October 2010, and that's this issue between labeling the condition report a Bravo or a Charlie,  The incident where the two men, Mr. Pease and Mr. Sanders, had a dispute again outside this meeting, these arguments were in private. They were never in front of the management team, concerned an issue regarding the location where contractors would undergo the badging process. That is no longer being pursued on appeal. That was actually the question I was trying to pursue with opposing counsel. It may not be a direct claim, but is it evidence of potential, potential evidence of motivation that would be relevant anyway to a fact finder? I couldn't say no, never, but what is not disputed is that the decision makers here, Mr. Atkinson, Mr. Mikhazy, and Mr. Sawatsky, the chief nuclear officer, had no knowledge and there's no evidence in the record that those three people who were responsible for making the disciplinary and ultimately the termination decision had any awareness of this incident where the two men had a disagreement and where Mr. Pease is alleged to have said to Mr. Sanders, that's twice and I owe you. Well, for purposes of summary judgment, we have to take that as true. I don't dispute that. That's correct. In 2010, Mr. Sanders testified that his conversation outside the meeting room between Mr. Pease and Mr. Sanders, Mr. Sanders testified that Mr. Pease did not state anything to him that he considered threatening or took in a retaliatory nature. The two men had a disagreement. The next day they returned to the meeting and Mr. Sanders conceded the point. He may not have, it may not have been his choice, but he testified he was no longer interested in arguing it any further. Does that mean, if I say to an employer, let's use a completely different kind of discrimination, let's just say someone comes in and reports that women are underpaid in the company and they have a long heated discussion and finally the person says, never mind, I give up. I'm not going to pursue it. Does that mean that they didn't complain and they can't be retaliated against if they stop complaining at some point? I think if I follow your hypothetical and add the passage of time here, certainly I do think that those sort of facts wouldn't support a claim under the Energy Reorganization Act. But is it because there isn't whistleblowing or is it because it bears on causation? Because those are two completely different things. No, it doesn't arise to whistleblowing under the statute. The statute requires an individual who is asserting or engaging in protected activity to identify a violation of the Energy Reorganization Act or the Atomic Energy Act or one of the NRC regulations. None of those issues were raised here. Well, it has a catch-all that protects employees, quote, in any other action to carry out the purposes of this chapter or of the statute. So there's a pretty broad protection when workers call to management's attention concerns for safety or quality. So why wouldn't it fall within the catch-all? I'll answer that question this way, Your Honor. Because there's no dispute that at no point, either October 2010 or thereafter, did Mr. Sanders assert that the Bravo-Charlie labeling dispute had anything to do or violated any Energy Reorganization Act statutory provision or NRC regulation. Or the purposes of the chapter. So if there's something, let's say, under OSHA, and if someone comes and says, you know, there's an open flame over here, it's a problem. I think that there's a problem there. And if they don't say OSHA, then somehow they can't be retaliated against because they haven't brought a safety complaint? I mean, that's sort of the implication of your argument, I think. And in those circumstances, I think that the answer to your question would be yes, depending upon the facts. It may not trigger the valid. Even though it's clearly about safety? And if someone says, I'm going to fire you, it clearly says I'm firing you because you complained about the open flame. You're out of here. I don't want to hear that kind of stuff. And even though it's clearly about safety of the workplace that you're saying that, summary judgment for the employer? No, not under that hypothetical, absolutely not. Under the facts of this case, though, none of those things occurred. Mr. Sanders never asserted that the dispute, the way it was resolved and the way he ultimately agreed to it, being a Charlie versus a Bravo, was acceptable. Number two, there is no evidence in the record that by labeling these conditions or a condition report, a Bravo versus a Charlie, means anything materially different in terms of how the problem is resolved. I thought definitionally they got more scrutiny as they worked their way up the ladder. I thought that was part of the definition. I don't believe that's correct, Your Honor. I think it's primarily an order of priority, if you will. Well, even if that's true, why wouldn't that be sufficient? Because I don't think it does. The issue here isn't whether the company didn't ignore the issue. The company accepted the issue and was addressing the issue. Well, so let's go back to my open flame example. Let's say, well, yeah, we know there's an open flame, but we have 25 things we're going to fix before we get to that. Don't worry. We'll get to it maybe in six months. Still, no longer a safety issue? If those facts were present in this record, I wouldn't be able to make that argument with a straight face. But on the facts of this record, the dispute between these two men was simply a matter of when are we going to get to it. Okay, but timing can be a safety issue, at least in theory. It could be. And intensity of investigation, at least in theory, can be a safety issue or a security issue. It could be. But, again, on the record of the case, there is no testimony, there's no evidence, that the distinction between a Bravo and a Charlie designation had anything more to do than the order in which they will be addressed. They're all considered to be important issues. They're all going to be addressed, and they're all going to be addressed promptly. So you would disagree with Mr. Wedby's articulation of the four levels as being more than just a timing issue? Yes. Primarily, there is more work that goes into it, if you will. A root cause analysis is a very complex approach to problem solving, and that's very different from sort of a quick look-see. And I don't know how that gets factored into the scale of A through D, but I suspect there's more to it than just timing. They pretty much pursue root cause analysis on all of these condition reports in order to resolve them. Root cause analysis, as I understand it, and I have to say I'm no expert on the subject, is a relatively complex decision-making model that takes time, if properly done, and can result in all kinds of things besides simply addressing the particular issue that started the inquiry. And that's the nature in which they address these condition reports. All of them are addressed with a sort of thoroughness, if you will, that would be typical of a root cause analysis. Now, the thoroughness, or I should say the extent or the scope of the root cause analysis, is going to be defined by the issue that the condition report identifies, obviously. And the issue, as I understand it, was a retrospective examination of how we were handling the return of badges from contractors who were permitted with the badges to enter unescorted into sensitive areas of the nuclear power plant. No, these are people who had left the employment or the service of the contractor. Getting the badges back. The badges had to be canceled. Right. Correct. Okay. So it's a retrospective analysis of how we were handling the return of these badges that otherwise were still valid and permitted the holder essentially unrestricted access to very sensitive areas of a nuclear power plant. That's true. But in order to receive a badge or unescorted access, they have to first pass an effective background check, a criminal background check. So anyone who has one is considered by the Nuclear Regulatory Commission safe to go within the protected areas within the plant. But still, it is important, and the company acknowledged it was important, to timely cancel those badges when either employment ends or their service with a contractor ends. And in these two instances, they found reports were made, which Mr. Sanders did not initiate or participate in any way. It didn't affect his department with respect to this one that Mr. Pease and he argued about. Nevertheless, they were important issues and they were addressed, and no one contended that they were trivial or could wait another day. I think ultimately the district court identified that this was at root a personality dispute between these two gentlemen, Mr. Pease and Mr. Sanders. But the issue did not specifically and definitively identify any safety issue. Why does it have to be definitive for purposes of summary judgment? Doesn't it have to be definitive in your direction for it to be appropriate for summary judgment? Well, this court, I don't think, has had occasion to pass on the issue. There are two Eleventh Circuit cases and one Sixth Circuit case, which are the leading cases, if you will, on this area. The Stone and Webster case, the Bechtel construction, and the American Nuclear Resources case. It seemed a lot like Bechtel to me. Pardon me? This case seemed a lot like the Bechtel case to me. I don't know. I thought it was a little more like the American Nuclear Resources case. Yeah, I thought you might. That's why they call it oral argument. Yeah. I don't think because the issue in Bechtel, if my memory serves me right, had to do with fire safety as opposed to in a gentleman who initiated the complaint repeatedly and no action management was in acknowledging that the issue needed to be addressed. So the facts, I think, were materially different than what we're hearing today. The fact that there was a personality disagreement, that they didn't like each other potentially or whatever that personal issue may be, that doesn't preclude as a matter of law either that there's a safety complaint or that there's retaliation, does it? No, it does not. No, I'm not suggesting that that precludes any finding to the contrary. But, again, on the evidence of the case here, Mr. Pease was not involved in the decision to discipline or terminate, nor were the decision makers aware of this argument that these two gentlemen had seven, or perhaps seven months prior to the time that his employment was terminated. Mr. Meals, would you agree that if we were to decide that the case has to be remanded on the issue both of you have been addressing, the district court has never addressed the employer's justification for the termination, the fraudulent submission of per diem by the boyfriend of Mr. Sanders' daughter? That's correct, Your Honor. The court noted it but didn't decide it. So the court's thoughts on that are clearly dicta. It would need to be explored further on a remand if that were the court's decision. I agree with that. Thank you, counsel. Your time has expired. I noticed that, and I was gathering my papers and listening to questions. I thank the court. It was very gracefully done. Thank you, Mr. Meals. Mr. Wedby, you have some rebuttal time remaining, about two and a half minutes worth. I just want to quickly return to the idea that the March 2011, I think as Judge Graber accurately surmised, did concern the ongoing issue of safety standards or the badging procedures, which by implication had safety concerns. And it was that statement by Mr. Peace, that's twice I owe you, I think that exhibits the retaliatory animus. And that statement was allegedly made at that same time as this discussion was occurring in the February-March 2011 timeframe. It was when the management asked him to step outside. They stepped out in the hall, and they said what they said. I think it actually after, because management agreed with Mr. Sanders. And then at that point, I think Mr. Peace said, that's twice I owe you. Okay. And then it's the next morning that your client allegedly says something along the lines of, I'm acceding on this issue. Or I'm not going to pursue it further. Not going to fight about it anymore, I think is what the idea was. Okay. Well, now, I get confused, and I'm asking for help here. Okay. Now, Mr. Peace was not the one who classified this one way or the other. Or was he? No, he was not. And it's the classification that you say is the foul ball in all of this. I may have spoken in error, Your Honor. I'm sorry. It was Mr. Peace's recommendation that it should have the designation. Yeah. And it was rejected by management ultimately. Yeah. And the other guy disagreed with him. The plaintiff disagreed. But he did not decide the classification. Neither of these two men did. That's correct, Your Honor. And the fact that one was classified as a C is what we're talking about as a dereliction in safety, right? I don't think the case doesn't boil down to one particular. I know it doesn't, but you're complaining about the classification being a C instead of a B. The thrust of the position is that there were discrepancies in how that was done, and Mr. Sanders was concerned that there should be no discrepancies, and that he was advocating for a uniform system that was played out in the Alpha Bravo distinction. But that was a standard that somebody other than Mr. Peace ought to abide by. Ultimately, it would be somebody else that would make the decision. And so it was the decision-makers on this that put, in your contention, the foul ball in this whole procedure. They classified it wrong. It wasn't this guy. It was the people that were listening to the two of them, right? Right. Now, are you claiming that the whistleblowing was done to call attention to the decision-makers or to call attention to what Peace was saying? The whistleblowing related to the inconsistent standard, and I think if the court looks at the Williams decision and its three criteria, that that's what should come into play, that the concern expressed must be specific to the extent it relates to a practice, condition, directive, or occurrence. And I think it's the practice here that is at play. But it's not the conduct of Peace. The dispute between Peace and Sanders exposed the fact that there was not a consistent standard approach to these distinctions. And I think that is all that's called for under the Williams criteria that I would ask this court to adopt as it's consistent with the sister circuits, the 6th and 11th, and that under that standard at the summary judgment phase, I think that there are disputed issues of material fact that should allow this to go forward. You understand in a whistleblowing context my concern, do you not? I do, Your Honor. And you've answered it the way you want to? Yes, Your Honor. All right. Thank you, counsel. The case just argued is submitted, and we very much appreciate the helpful arguments of both counsel in this very challenging and interesting case.
judges: Leavy, Graber, Tallman